1  Thomas F. Dasse (AZ Bar No. 005409)
   LAW OFFICES OF THOMAS F. DASSE, P.C.
2  14646 North Kierland Blvd. Suite 235
   Scottsdale, Arizona 85254
3  (480) 998-8222

4  Attorneys for Plaintiffs Jonathan M. Walton,
   Clyde Walton and Reeko Walton

5

   Linda B. Williamson, Esq.
6  LUCIA STARK WILLIAMSON LLP
   2700 North Central Avenue, Suite 1400
7  Phoenix, Arizona 85004
   (602) 285-4421
8
   Attorneys for Plaintiffs Nicole Williams and Kaysi Walton
9

10                  IN THE UNITED STATES DISTRICT COURT

11                      FOR THE DISTRICT OF ARIZONA

12
   JONATHAN M. WALTON; CLYDE        )    No. CIV-05-3027-PHX-ROS
13 et al.                           )
                                    )    PLAINTIFFS' MOTION IN
14              Plaintiffs,         )    LIMINE RE TESTIMONY
                                    )    OF "HUMAN FACTORS"
15      vs.                         )    EXPERT THOMAS BLACK
                                    )
16 BRIDGESTONE/FIRESTONE, INC.,     )
                                    )
17 et al.                           )
                                    )    (Assigned to Hon. Roslyn O. Silver)
18              Defendants.         )
   _____)    (Oral Argument Requested)
19

20         Pursuant to Rules 104, 402, and 403, Fed. Rules of Evidence, Plaintiffs request an

21 order of the court prohibiting the defendants and their attorneys from referencing in any

22 fashion in the presence of the jury the following: wide ranging opinions from a so called

23 "human factors" expert that (1) plaintiff violated the law and engaged in risk taking by

24 failing to wear a seat belt, and (2) tire failures are minor events that are easily controlled and

25 plaintiff was inattentive and overreacted to the subject tire tread separation, and (3) driving

26 while using a mobile phone is dangerous and plaintiff's use of such a device caused the

27 subject accident. Some of these challenged opinions are not "helpful", but are rather in the

28 nature of lawyer arguments. Other opinions are not supported by any reliable methodology.

1   This motion is supported by the following memorandum of points and authorities, as well as

2   the attached exhibits.

3        RESPECTFULLY submitted this 3rd day of <u>October</u>, 2008.

4                    LAW OFFICES OF THOMAS F. DASSE, P.C.

5

6                 By:     /s/ Thomas F. Dasse
                     Thomas F. Dasse

7                        14646 North Kierland Blvd.
                     Suite 235

8                        Scottsdale, Arizona 85254
                     Attorney for Plaintiffs Walton

9

10              LUCIA STARK WILLIAMSON LLP

11                   /s/ Thomas F. Dasse With Permission
              By:   Linda B. Williamson

12                       2700 North Central Avenue
                     Suite 1400

13                       Phoenix, Arizona 85004

14                       Attorneys for Plaintiffs Nicole Williams
                     and Kaysi Walton

15

16              **MEMORANDUM OF POINTS AND AUTHORITIES**

17  I.     INTRODUCTION

18       In this case Firestone produced a report from a so called "human factors" expert

19  (Mr. Thomas Black) and indicated that it would be calling him as an expert witness at

20  trial. Plaintiffs have deposed Mr. Black and confirmed that he has wide ranging opinions

21  that include usage of occupant restraints, usage of mobile telephones, and the ease with

22  which vehicles can be controlled following tread separations. We set forth below the

23  reasons why this court should exercise its discretion and exclude the various opinions

24  which Mr. Black is prepared to offer in this case. We begin by setting forth the existing

25  case law on the admissibility of so called "human factors' experts. We then address the

26  shortcomings of each of the proffered opinions under the Federal Rules of Evidence.

27  Because Mr. Black's opinions are wide ranging and virtually limitless, we have placed

28  them in three distinct categories: (1) occupant restraints, (2) controlling a tire failure

1   event, and (3) driving while using a mobile telephone.

2   II.     LAW AND ARGUMENT

3   A.      The Admissibility of Testimony From "Human Factors" Experts

4          Courts have repeatedly cautioned against the admission of opinions by so called

5   human factors experts as being either unnecessary or failing the type of "reliability"

6   scrutiny required by Rule 701. One good example is *Hamilton v. Emerson Electric*

7   *Company*, 113 F.Supp.2d 360 (D.C. PA 2001). There the trial court utilized a *Daubert*

8   analysis to exclude the proposed testimony of a human factors expert concerning the

9   plaintiff's thought processes. However, it also persuasively held:

10              Although Emerson successfully argues that Dr. Wilcox's testimony
    is unreliable under *Daubert*, it fails to raise the most compelling argument
11   against its admission.  Dr. Wilcox's testimony should be excluded because
    it would not assist the jurors in determining anything that they could not
12   determine themselves.  "As a general principle, expert evidence is not
    necessary if all the primary facts can be accurately and intelligibly described
13   to the jury, and if they, as persons of common understanding, are as capable
    of comprehending the primary facts and of drawing correct conclusions
14   from them as are witnesses possessed of special or peculiar training of the
    subject under investigation."  *Oddi, 234 F.3d at 159* (citations and internal
15   quotation marks omitted).  Expert testimony is more likely to be
    inadmissible if the inferences drawn by the expert are ones that can be, and
16   typically are, made from common observation. *31A Am.Jur.2d Expert and
    Opinion Evidence § 43.*

17
              Courts have been prone to exclude the testimony of "human factors"
18   experts when the facts and inferences to which they testified were within
    the common knowledge of jurors.  In *Scott v. Sears Roebuck & Co., 789
19   F.2d 1052, 1054 (4th Cir. 1986)*, the Fourth Circuit, in reviewing a motion
    for a new trial on a personal injury action involving a defective curb, found
20   that the district court improperly admitted statistical evidence that persons
    wearing high heels tend to avoid walking on grates.  The court explained
21   that the evidence was excluded because "the witness was simply repeating
    what is common knowledge and common sense." Id.  Other courts have
22   reached similar results.  See *Persiner v. Norfolk & W. Ry. Co., 920 F.2d
    1185, 1186, 1188 (4th Cir. 1990)* (finding that human factors expert "did no
23   more than state the obvious" where his testimony, "when stripped of its
    technical gloss," was that it was more difficult to lift an object from a seated
24   position); *Christopher v. Madison Hotel Corp., 875 F.2d 314 (4th Cir. 1989)*
    (upholding the district court's exclusion of plaintiff's expert testimony
25   explaining friction tests on a bathroom floor because "it is common
    knowledge that shiny bathroom floors are slippery"); *United States v. Afflec,
26   776 F.2d 1451, 1458 (10th Cir. 1985)* (affirming the district court's
    exclusion of the testimony of a "memory expert" because "the average
27   person is not able to understand that people forget.").

28   113 F.Supp.2d at 374.

1    Some courts have recognized that human factors experts are called by parties to

2  tell the jury, however indirectly, how the jury should decide the case. One court didn't

3  mince words in excluding testimony from human factors experts hired by both sides of

4  the case:

5       "Human factors" experts appear to this court to resemble the old
        time "jack of all trades;" "he is master of none".

6
        In any event, the court concludes that a jury will not benefit from
7       exposure to "human factors" experts in this case. Their opinions, such as
        the one quoted above and the contrary opinions offered by defendant's
8       "human factors" experts will not aid the jury in determining the facts. The
        court also concludes that the fact issues in this case are not beyond the
9       common understanding of the average juror and thus conflicting expert
        opinions will not assist, indeed, they are more likely to confuse, the jury, the
10      adequacy of the warning is a factual issue which the jury can handle without
        expert help from either side. The issue to be decided by the jury, applying
11      appropriate instructions on the law, is whether, considering all the
        circumstances, the "warning or instruction" provided by defendant was
12      sufficient to deter an ordinary reasonable user from acting as plaintiff did.
        R.S. 9:2800.53(9).
13
        While the views, suggestions and opinions of "human factors"
14      experts may well be helpful to manufacturers and others who are preparing
        and designing labels for products, the court concludes that no expert for
15      either side will be allowed to tell the jury how to decide this case. *Garwood
        v. International Paper Co.*, 666 F.2d 217 (5th Cir. 1982); *Washington v.
16      Armstrong World Industries, Inc.*, 839 F.2d 1121 (5th Cir. 1988).

17      The motion of defendant will be granted and the court *sua sponte*
        rules that no "human factors" expert will testify to the jury.
18

19  *Calvit v. The Proctor & Gamble Manufacturing Co.*, 207 F. Supp. 2d 527,528-529 (M.D.

20  La. 2002). See also *Stepney v. Dildy*, 128 F.R.D. 77 (1989) (excluding opinions of a

21  human factors expert while cautioning that the evaluation of the commonplace by an

22  expert witness might supplant a jury's independent exercise of common sense); *Nisanov*

23  *v. Black & Decker*, 2008 U.S. Dist. LEXIS 27044 (2008) (excluding opinions of a human

24  factors expert as little more than common sense and where his theories to the subject case

25  seemed more impressionistic , subjective and conclusory than scientific); and *McNabb v.*

26  *Graham Gulf, Inc.*, 2005 U.S. Dist. LEXIS 8031 (concluding the "human startle

27  response" was within the common understanding of the average juror; court found that it

28  "offered little more than what lawyers can offer in argument" and testimony from Ph.D.

4

1   human factors expert was excluded).

2   B.    The Court Should Exclude the Testimony of Mr. Black Concerning Plaintiff's

3         Alleged Failure to Use Occupant Restraints

4         Among the many subjects discussed in Mr. Black's report and in his deposition,

5   one concerns the issue of occupant restraints. Mr. Black is not trained or qualified in the

6   field of biomechanics or occupant kinematics.[1] He has not examined the Walton vehicle

7   or its occupant restraint system. He has not examined any of plaintiff's medical records in

8   an attempt to correlate specific injuries with how Mr. Walton's body moved within the

9   vehicle (or outside the vehicle). Nor has he attempted to reconstruct just how Mr.

10  Walton's body would have moved within the vehicle if he had been restrained, and just

11  what injuries he would have experienced under that scenario. Nor has he attempted to

12  analyze the effectiveness of restraints in rollover accidents of the type involved in this

13  case. Nor has he any attempted to analyze their effectiveness in preventing injuries to

14  someone positioned on the far side of the roll in a high speed rollover (where the risk to

15  someone in Mr. Walton's position is many times higher than to a passenger on the leading

16  side of the roll). Nonetheless, it is anticipated that Firestone will attempt to elicit

17  testimony from Mr. Black at trial consistent with the following statements found in his

18  report:

19          Mr. Walton was not wearing his seat belt and shoulder harness as required
            by the Arizona Vehicle Code. As a result, he was ejected during the rollover
20          and suffered serious injuries. It has been recognized for over 30 years that
            seat belt restraints are an important part of safe driving. Typically drivers
21          who remain in the vehicle restrained during a rollover suffer fewer injuries.
            Mr. Walton was taking additional risk by driving on the freeway without
22          wearing his seat belt and shoulder harness restraint system.

23  See attached Exhibit "1".

24          There is no foundation for Mr. Black's disclosed "testimony", as quoted above.

25  Mr. Black based his conclusion that Mr. Walton was not wearing his seat belt on the

26  _____

27          [1] Defendants have separately retained an expert in the field of biomechanics (Jagmar
       Jewkes) who is prepared to offer opinions concerning Mr. Walton's alleged failure to use
28  occupant restraints and its impact on his injuries. Thus, any opinions from Mr. Black in this
       subject area should be excluded as unnecessarily cumulative. Rule 403, F.R.E.

1  conclusion of an investigating officer who is admittedly  unqualified to offer expert

2  testimony on this point. His opinion that "as a result, (Mr. Walton) was ejected during the

3  rollover and suffered serious injuries" is based on nothing more than Mr. Black's surmise

4  and speculation. The man's observations about the typical experience of drivers who

5  remain in the vehicle is misleading since it necessarily includes restrained and

6  unrestrained motorists in dissimilar conditions. He has made absolutely no effort to

7  analyze any of the variables that dramatically impact the final result here - position of the

8  occupant (leading side versus trailing side), available head room, amount of roof crush

9  and other intrusions into the occupant space, number of vehicle rolls, presence or absence

10  of pretensioner; presence or absence of cinching latch plate, position of the anchor (seat

11  mounted or not), etc.

12      The jury does not need Mr. Black telling them the law concerning seat belt usage.

13  The statement concerning Mr. Walton taking on "additional risk" is really a matter of

14  lawyer argument, and Mr. Black's biased and unsupported conclusions on this point do

15  not meet the threshold requirement that expert testimony be "helpful". Testimony

16  consistent with the statements set forth above is irrelevant and misleading, and should be

17  excluded from this case. *Rule 403, Fed. Rules of Evidence*.

18  C.    The Court Should Exclude the Testimony of Dr. Black Concerning Plaintiff's

19        Alleged "Overreaction, Inappropriate Steering, and Poorly Executed Directional

20        and Positional Control"

21      Mr. Black has put together a laundry list of human failings that might lead to an

22  accident. He has then picked from this list the ones that he thinks apply to Jon Walton's

23  accident .On that list are "overreaction, inappropriate steering and poorly executed

24  directional and positional control". As it relates to vehicle control, Mr. Black's report

25  includes the following:

26      From experimentation and the literature it has been found that a tire
        disablement is normally a minor event – with forces well within the
27      capability of normal drivers to maintain control of the vehicle. This allows
        drivers to safely pull over to the side of the road. Therefore I would not
28      expect a tire event to be the cause of this accident.

6

1  See attached Exhibit "1".

2       Mr. Black's reference to general "experimentation" and "literature" is misleading

3  and unreliable because all of the references lump together all types of disablements

4  (including slow leaks and sidewall failures) at all speeds and involving a database of

5  vehicles dissimilar to the one involved in this case. For example, the ability of a motorist

6  to control a Cadillac sedan at 30 mph when he has a slow leak has little, if any, probative

7  value when considering the facts presented here, yet this is very kind of data that is

8  included in each of the referenced databases. None of the studies and testing referenced in

9  Mr. Black's report isolate facts substantially similar to those here – a driver of a Mercury

10  Mountaineer (a Ford Explorer with a different name) being driven in excess of 65 mph

11  that experiences a rear tread separation of a steel belted radial tire. Old databases such as

12  the Baker study (40 years old), with its report on the experience of motorists under

13  conditions dissimilar to what is present here, remain misleading and inadmissible even if

14  someone such as Mr. Black tries to rely on them for his "human factors" opinions.

15       Mr. Black is not a motor vehicle accident reconstructionist. Nor is he an expert in

16  vehicle dynamics.[2] He cannot say, for example, that Jon moved his steering wheel some

17  90 degrees to the right, when an appropriate response was only some 70 degrees. Nor can

18  he say how a Mountaineer would react to steering input as opposed to some other vehicle,

19  including any of the vehicles involved in any of the studies that he cites in his report. In

20  fact, at his deposition he continuously avoided answering any cross examination

21  concerning his "failure to control" opinions by deferring to the vehicle dynamics experts

22  hired by Firestone. Illustrative examples include:

23      Q.    Can you tell us anything about the understeer gradient of any of the
             vehicles that  were part of this study?

24      A.    Well, first all, I'm the wrong guy to ask. I'm a human factors guy.
             The people to look at that would be the vehicle dynamics people. (P.

25              53)

26  _____

27      [2] Defendants have separately retained experts in each of these fields who are prepared to
offer opinions concerning the actions of the vehicle and the driver. Thus, any opinions from Mr.

28  Black in these subject areas should be excluded as unnecessarily cumulative. Rule 403, F.R.E.

1                                                ...

2    Q.   Would you agree with the general notion if drivers are at a speed of
          55 miles per hour, they may not have a loss of control where as
3         everything else being equal if they're at 70 to 75 miles an hour they
          may well lose control during a tire disablement?
4    A.   That's a vehicle dynamics issue. I'll leave that to the vehicle
          dynamics people. (P. 66)
5                                                ...

6    Q.   Did you do anything in this case to evaluate the relative ease or
          difficulty associated with controlling a tread separation when that
7         tread separation event occurs on a 1997 Mercury Mountaineer.
     A.   No, I have made no analysis in this case of the Mercury Mountaineer
8         in this case. I have read about vehicles, but, again, the vehicles is not
          my area of expertise. (P. 67)
9                                                ...

10   Q.   Would you agree with the statement that oversteer can make a
          vehicle directionally unstable subject to loss of control in the hands
11        of most drivers?
          MR. BROSSEAU:   Objection. Foundation.
12   A.   Again, I'm not a vehicle dynamics expert. (P. 69)
                                        ...
13   Q.   How much did he turn the steering wheel to the right?
     A.   Again, I will leave that to the dynamics people.
14   Q.   Well, if you are going to be critical of how much he turned to the
          right, I need to know how much you believe he turned and what
15        yardstick you are measuring that against?
     MR. BROSSEAU: Objection. Form. Argumentative.
16
     A.   I don't think you need to know that because clearly he turned too
17        much to the right and he crossed not only his own lane but the No. 2
          lane and eventually went off the road. That is way too much.
18   Q.   So the mere fact that he did, in fact, lose control in your mind
          suggests you that he, indeed, poorly executed the steering control.
19   A.   In the right-hand turn, yes. (Pp. 87-88)

20   Black depo., pp. 53, 67-69, 87, 88 (attached as Exhibit "2")

21        Stripped of all of the accompanying fluff, Mr. Black's opinions of overreaction

22   and inappropriate steering are based on (1) the fact that Jon lost control of the vehicle,

23   and (2) other motorists and test engineers at lower speeds driving dissimilar vehicles have

24   managed to maintain control following some type of tire failure. There is nothing

25   scientific or reliable about Mr. Black's cavalier "analysis".

26        In this case it would be patently unfair and misleading for Mr. Black to, in effect,

27   compare the inability of Mr. Walton to maintain control against the results achieved by

28   other motorists driving differently designed motor vehicles at lower speeds while

                                             8

1  blocking all cross examination through the "deferral to others" tactic. Yet this is exactly

2  what he is attempting to do. Testimony from Mr. Black concerning vehicle control

3  following tire failure lacks necessary foundation to make it relevant; it is unreliable; it is

4  misleading; and it is unnecessarily cumulative. For all of these reasons, it should be

5  excluded.

6  D.    The Court Should Exclude the Testimony of Dr. Black Concerning Plaintiff's

7         Alleged "Inattention and Distraction" Due to a Hands Free Telephone

8  Conversation

9         In his report to Firestone's lawyers in this case, Mr. Black states:

10         The literature has shown that telephone conversations can be a distraction
           from the driving task. Because of the lengthy conversation, Mr. Walton at
11         time would have likely been distracted from the driving task.

12  Mr. Black then lists as a part of his "conclusion" that "distraction" was a cause of this

13  accident. See attached Exhibit "1".

14         At his deposition, he revealed that there was really no scientific basis for an expert

15  opinion that this particular accident was caused by cell phone use:

16     Q.    What's a scientific basis for concluding that cell phone usage played
             any role in this particular accident?
17     A.    I think the scientific basis is the statistics the fact that it is shown
             overwhelmingly that the risk of an accident increases with cell phone
18           use. Not only from the data that's been collected from actual
             accidents but also from the standpoint of tests that are run with
19           people using cell phones or cell phone-like systems and making
             driver decisions. They have found, for example, when people are on
20           cell phones, they drive through interactions (sic). They don't stop at
             stop signs like during tests. There is also anecdotal information that
21           indicates that drivers have been seen to clearly drive up behind a
             person that is stopped at a railroad crossing with the gates down and
22           instead of stopping, they pull around and go across the railroad have
             an accident. This goes on and on and on.
23
    Black depo., pp 96-97 (attached Exhibit "2").
24
           There have been hundreds of individuals who were **not** using a mobile telephone
25
    who nonetheless lost control of an Explorer or Mountaineer following a tread separation.[3]
26

27         _____

28         [3]There were so many that Firestone hired Dr. Dennis Guenther to examine the issue. Dr.
    Guenther found that Ford Explorers were designed with a significantly lower amount of
    "understeer" than other SUV's he evaluated, less than half as much as the Jeep Cherokee and

1  Mr. Black does not consider any of these incidents in his "analysis". Again, stripped of

2  the fluff, the opinion that Jon Walton was distracted and inattentive and this caused the

3  accident is simply based on (1) the fact that he was engaged in a conversation on a

4  wireless (hands free) telephone, and (2) conversing with another while driving has been

5  recognized as potentially distracting, and (3) there was an accident here.

6  Conclusion

7      The opinions of Thomas Black concerning this case are impressionistic, subjective,

8  conclusory, and argumentative. His entire approach is unreliable and his testimony

9  unnecessarily cumulative to the testimony of other experts retained by defendants.

10  Further, he is no better qualified than the jury to determine whether Jon Walton was in

11  fact inattentive and distracted by a telephone conversation and whether this in fact was a

12  cause of the accident. Similarly, Mr. Black is no better qualified than the jury to

13  determine (1) if Jon Walton overreacted and whether any such overreaction was a cause

14  of the accident, or (2) his alleged failure to be belted resulted in enhanced injuries. His

15  testimony should be excluded from this case.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  _____

25  Chevrolet Blazer.  According to Firestone, Dr. Guenther found that Explorers lost all of their "understeer" and become oversteer vehicles in most circumstances following tread separation on

26  a rear tire. According to a formal statement issued by Firestone, "an oversteer vehicle is extremely difficult for most drivers to control, particularly at interstate highway speeds where it

27  can become directionally unstable". In the words of Firestone's President and CEO: "Dr. Guenther has concluded that the Explorers as tested ... have an inadequate margin of control (due

28  to insufficient understeer) to permit control by average drivers in the foreseeable events of tread separation during normal highway driving in most load and turning circumstances."

1    RESPECTFULLY submitted this 3rd day of October, 2008.

2

3                                             LAW OFFICES OF THOMAS F. DASSE, P.C.

4

5                                  By:        /s/ Thomas F. Dasse
                                              Thomas F. Dasse
6                                             14646 North Kierland Blvd.
                                              Suite 235
7                                             Scottsdale, Arizona 85254
                                              Attorney for Plaintiffs Walton

8                                  LUCIA STARK WILLIAMSON LLP

9
                                              /s/ Thomas F. Dasse With Permission
10                                 By:        Linda B. Williamson
                                              2700 North Central Avenue
11                                            Suite 1400
                                              Phoenix, Arizona 85004

12                                            Attorneys for Plaintiffs Nicole Williams
                                              and Kaysi Walton
13

14

15   ORIGINAL of the foregoing e-filed
     and one COPY electronically delivered
16   this 3rd day of October, 2008, to:

17   Honorable Roslyn Silver
     UNITED STATES DISTRICT COURT
18   401 West Washington
     Phoenix, Arizona 85003
19
     One COPY electronically and mailed
20   United States Mail First Class Postage prepaid
     this 3rd day of October, 2008, to:
21
     Scott Freeman, Esq.
22   FENNEMORE CRAIG
     3003 North Central Avenue
     Suite 2600
23   Phoenix, Arizona 85012
     Attorneys for Defendant Bridgestone Firestone North American Tire, LLC
24
     Anthony J. Hancock, Esq.
25   BEAUGUREAU, ZUKOWSKI & HANCOCK, P.C.
     2111 East Highland Avenue
     Suite 255
26   Phoenix, Arizona  85016
     Counsel for Defendant Sears Roebuck and Co.
27   / / /

28   / / /

                                        11

1 Linda B. Williamson, Esq.
   LUCIA STARK WILLIAMSON LLP
2 2700 North Central Avenue
   Suite 1400
3 Phoenix, Arizona 85004
   Attorneys for Plaintiffs Nicole Williams and Kaysi Walton

4

5
   /s/ Pamela Holmes
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28