**EXHIBIT "1"**

**California Safety Associates, Inc.** South Los Morros, P.O. 729
Rancho Santa Fe, CA 92067-0729
(858) 756-1235
FAX (858) 756-1235

August 21, 2007

William L. Thorpe
Fennemore Craig, P.C.
3003 North Central Ave., Suite 2600
Phoenix, AZ 85012-2913

**Re: Walton vs. Bridgestone/Firestone, et al**

Dear Mr. Thorpe:

I was asked by your office to analyze the Walton accident and to evaluate the Human Factors issues involved in this accident.

## BACKGROUND

I am a practicing Safety and Human Factors Engineer with over 25 years of experience. I hold a Bachelor of Mechanical Engineering degree from General Motors Institute, and a Masters of Engineering and a Ph.D. with a specialty in Safety and Human Factors from Texas A&M University. I was employed by General Motors at the GM Technical Center in the Safety and Human Performance Laboratory. I was the Manager of Safety and Human Factors at Rohr Industries. Also I have taught Safety and Human Factors courses at San Diego State University, and The University of California at San Diego. Currently I am President of California Safety Associates, Inc. A copy of my resume is attached which provides more details regarding my background as well as a listing of my publications.

## ACCIDENT DESCRIPTION

According to the Traffic Collision Report, Mr. Jonathon Walton (25 years old) was driving a 1997 Mercury Mountaineer (SUV) on July 21, 2003, at approximately 6:14 pm when an accident occurred. He was driving on Interstate I-10 on a straight section of freeway, eastbound, in La Paz County, Milepost 34.8, and west of Phoenix, Arizona. The report indicates the speed limit was 75mph and is asphalt, in good condition with the road climbing a small crest with visibility free of obstructions. The weather was clear.

EXHIBIT 3
DATE 11/20/07
NAME Black
DENISE T. JOHNSON
CSR NO. 11902

Following the accident it was reported that the left front tire was flat with the tire and wheel assembly broken off the spindle. The left rear tire was still inflated, but obviously low on air. The right front tire was flat. The right rear tire had the entire tread separated. A long piece of tread was recovered and appeared to match the other tires.

According to the Traffic Accident Report, Mr. Walton was traveling in the number 1 (high speed) lane eastbound when the entire tread separated from the right rear tire. The vehicle veered to the right and continued across the number 2 lane. As the vehicle was crossing the south side paved shoulder, Mr. Walton over corrected to the left which caused the vehicle to rotate counterclockwise into a near broadside slide on the dirt shoulder. The tires then dug into the dirt, causing the vehicle to begin a high speed rollover. The officer estimated at least 2 ¼ rolls coming to rest on its right side, facing north. It was reported that Mr. Walton was not wearing his seat belt and was ejected from the vehicle during one of the rolls. Mr. Walton was severely injured and was not responsive at the scene. There were no reported witnesses to the accident.

Mr. Walton's wife, Nicole Williams, testified that she was talking with Mr. Walton on his cell phone at the time of the accident (p.48). She heard him yell two separate explicatives and then she heard nothing else. She had been talking on and off throughout almost that whole time, and at that point maybe a half hour (p.51). The phone line stayed open until a witness later found the phone and told her what had occurred.

Mr. Walton had purchased new tires for the vehicle on November 2, 2000, at Sears. Mr. Walton had Sears repair a punctured right rear tire on the vehicle on March 2, 2002.

## INVESTIGATION

I have reviewed materials relating to the accident which you have provided as well as the literature which discusses vehicle handling resulting from tread separations and I have analyzed the Human Factors of the driving task. The materials provided include the following:

Arizona Traffic Accident Report
Photos of Accident Scene
Vehicle Service History

Sears Invoice for Sale of Tires
Sears Invoice for Flat Repair
Roy's Auto Invoices for Engine/Air Conditioning Work
Deposition of Jonathan Walton
Deposition of Nicole Williams
Deposition of Reeko Walton
Deposition of Clyde Walton
Complaint
Plaintiffs' Initial Disclosure Statement
Answer of Defendants
Defendant's Initial Disclosure Statement
Initial Disclosure Statement
Amended Answer of Defendant
Defendant's Answer
Notice of Filing Notice of Removal to United States District Court
Plaintiff's Answers to Interrogatories Regarding Vehicle History
Plaintiffs' Supplemental Disclosure Statement & Tire Expert Report

Some of the materials that I used to arrive at the preliminary conclusion rendered here, include the following:

"Driver/Vehicle Steering Response Latencies." *Human Factors, 23*. Pages 683-692 by H. Summala (1981b)
Forensic Aspects of Driver Perception and Response by Paul L. Olson, dtd 1996.
Anatomy of Accidents Following Tire Disablements by Ernest Z. Klein and Thomas L. Black, dtd 1999.
"Automobile Driver Characteristics and Capabilities - The Man off the Street." By R.S. Rice, et al., Society of Automotive Engineers, 1976
"Modeling and Simulation of Driver/Vehicle Interaction." by R. Wade Allen, 1996
"Vehicle Handling with Tire Tread Separation" by C. P. Dickerson, et al, SAE 1999-01-0450, 1999
"Drag and Steering Effects from Tire Tread Belt Separation" by R.J. Fay, et al, SAE 1999-01-0447
"Tire Disablement's and Accidents on High-Speed Roads, Parts 1-4." *Traffic Institute,* Northwestern University, by J. Stannard Baker and G. Declan McIlraith, dtd 1968.

"The Role of Tread/Belt Detachment in Accident Causation." *ITEC*, by Jim Gardner, dtd 1998.

"Driver Steering Reaction Time to Abrupt - Onset Crosswinds, as Measured in a Moving Base Driving Simulator." Walter W. Wienville et al., *Human Factors Journal* 1983, 25(1) 103-106.

The Motor Vehicle 10th Edition - K. Newton et al., Butterworth, London 1986

"The Role of Blowouts in Accident Causation," American Society of Mechanical Engineers, 87-WA/SAF4, James Gardner and Christopher Shapley, 1987

"Use of Rumble Strips to Enhance Safety", Douglas Harwood, National Cooperative Highway Research Program, National Academy Press, 1993

"Tri-Level Study of the Accidents," Indiana University at Bloomington, for National Highway Traffic Safety Administration, Washington, D.C. - NTIS PBB - 113772 - May 1979

"Human Factors in Traffic Safety," 2nd Edition, Robert Dewar and Paul Olson, Lawyers and Judges Publishing Co., Inc., 2007

"If You Drive While Phoning," Insurance Institute for Highway Safety- Status Report, Arlington, Va., Volume 40, Number 6, July 16, 2005.

## DISCUSSION

This report contains my preliminary analysis, opinions and conclusions in this matter. It is based upon my background, experience, the materials provided to date and research performed by me. The conclusions are based upon the results of this investigation and are expressed to a reasonable degree of engineering certainty. Further, I reserve the right to modify these opinions and conclusions as additional information may be received about this accident.

Mr. Walton was talking with his wife on a cell phone at the time of this accident. The literature has shown that telephone conversations can be a distraction from the driving task. Because of the lengthy conversation, Mr. Walton at times would have likely been distracted from the driving task.

Mr. Walton was not wearing his seat belt and shoulder harness as required by the Arizona Vehicle Code. As a result, he was ejected during the rollover and suffered serious injuries. It has been recognized for over 30 years that seat belt restraints are an important part of safe driving. Typically drivers who remain in the vehicle restrained during a

rollover suffer fewer injuries. Mr. Walton was taking additional risk by driving on the freeway without wearing his seat belt and shoulder harness restraint system.

There are three factors to evaluate when determining the cause of a vehicle accident. These factors are the Human, Vehicle and Environment. There has to be one or more of the following:

1. A driver whose actions contribute to or cause the accident.

2. A vehicle that causes or contributes to the accident.

3. The environment which causes or contributes to an accident. (Examples would include bad weather, unusual traffic conditions, poor roads, poor visibility conditions, etc.).

From experimentation and the literature it has been found that a tire disablement is normally a minor event – with forces well within the capability of normal drivers to maintain control of the vehicle. This allows drivers to safely pull over to the side of the road. Therefore I would not expect a tire event to be the cause of this accident.

Except in those cases involving an environmental condition obviously requiring driver decision making, I have not been asked to independently evaluate the second and third generic potential causes of vehicle accidents. Nothing in the material provided discussed an environmental condition as an issue in causation in this case at this time.

If the driver makes appropriate decisions and responses in a particular situation then I would not expect the driver to be the cause of the accident.

Drivers are continually required to make minor steering adjustments to maintain directional control of vehicles. For example, when a vehicle is suddenly affected by a puddle in the road, by a gust of wind, change of road crown, a blowout, wind gust from a large truck or etc., drivers routinely make the steering adjustment easily. Those adjustments are made without any more difficulty than normal steering while maintaining a vehicle within the lane. A gust of wind does not provide an advanced warning. In fact the driver is not reacting to a gust of wind; the driver is reacting to small changes in the direction of the vehicle and/or its position on the road, and the motion and forces sensed. No large over-correction or loss of control would be necessary or expected from this type of event. This is the same type of steering response which would occur during a tire disablement.

A driver's control during driving is commonly not affected by loud noises. (For example: the vehicle hits debris in the road and it slaps against the body of the car; the tires run through a puddle and water resonates against the under body; a truck blows an air horn in close proximity; or a tire has a blowout making a loud bang.) Drivers typically maintain control continuing in the same path. Drivers learn that they cannot make significant changes in speed or direction abruptly without the risk of losing control especially when traveling at high speeds. This is taught in driver's education as well as reinforced by driving experience.

The same principles apply to driver's actions following tire disablements. Drivers know how to change speed and direction carefully to avoid losing control. Research and studies of tire disablements have shown that this event is controlled successfully by holding the direction steady and then slowly decelerating the vehicle.

Tests of vehicles with detreaded tires support the conclusion that there is a slight pull on the vehicle to the side of the detreading. The pull does not result in vehicle movement out of its lane with proper driver responses. The tests and literature that have reported on this phenomenon have described this event as the lateral acceleration equivalent to a wind gust or a lane change and well within the driver's capability to control. From a human factors standpoint, the driver would be expected to put in only that amount of steering necessary to keep the vehicle straight, and in its path, and bring the vehicle to a safe stop without heavy or excessive braking.

Drivers are faced with a wide variety of circumstances, some of which began as poor driver decisions, and to which they must properly respond, or the driver becomes a cause of the event. Human driver decision making and subsequent responses can be contributing factors to vehicle accidents. The issues involved in this accident include one or more of the following:

Inattention
Sensory or behavior impairment
Risk taking
High speed
Fatigue
Perception and reaction time
Overreaction
Judgment errors
Poor coordination skill and timing
Driving experience
Driver training
Operating instructions

Distraction
Inappropriate steering and braking inputs
Poorly executed directional and positional control

**CONCLUSION**

I anticipate receiving additional information on this case which will assist in confirming or amending my opinions held at this time. With the information available to me at this time I believe the following are human factors causes of this accident: perception and reaction time, overreaction, inappropriate steering, risk taking, high speed, inattention, distraction, and poorly executed directional and positional control.

The foregoing opinions and conclusions are to a reasonable degree of engineering certainty, and are based on my experience, education and training in the field of human factors engineering. My compensation rate is $300.00/hr. Please understand that my opinions are based on the information that has been received, collected and reviewed. As more information becomes available it will be reviewed, and if necessary, I will review my opinions and revise them as necessary.

Very truly yours,

Thomas L. Black

Thomas L. Black, Ph.D., P.E.
President

# EXHIBIT "2"

APPEARANCES:

For the Plaintiff:

LAW OFFICE OF WILLIAM G. VOSE
BY: WILLIAM G. VOSE
One E. Camelback, Suite 550
Phoenix, California 85012-1650
602.287.0999, Fax: 602.445.9339

For the Defendants:

KERR, BROSSEAU, BARTLETT, O'BRIEN
BY: MARC R. BROSSEAU
1600 Broadway, Suite 1600
Denver, Colorado 80202
303.812.1200, Fax: 303.812.1212
E-mail: mbrosseau@kbbolaw.com

DEPOSITION OF THOMAS L. BLACK, PH.D., P.E., taken by the Plaintiff, commencing at the hour of 9:40 a.m. on Tuesday, November 20, 2007, at 555 West Beech Street, San Diego, California, before Denise T. Johnson, Certified Shorthand Reporter, in and for the State of California.

A. I don't know.

Q. Can we tell from the data available whether there were any radial tires involved in this study as opposed to -- tires?

A. There no radial tire mentioned.

Q. Can you tell from the data you have available to you whether there were any SUVs involved in this study?

A. I don't recall in that era that there was any such thing as an SUV.

Q. There was a study between September 1, 1966 and August 31, 1967, correct?

A. Correct.

Q. Can you tell us anything about the understeer gradient of any of the vehicles that were part of this study?

A. Well, first all, I'm the wrong guy to ask. I'm a human factors guy. The people to look at that would be the vehicle dynamics people.

Q. So the answer would be no?

A. Correct, I wouldn't be telling that. Correct.

Q. Do we know what the speed limit was of this particular tollway?

A. Yes, it is mentioned in this report.

Q. I'm looking for it. I'm just not finding it right away?

copy of Exhibit No. 9?

A. I don't recognize it.

Q. If I understand your report correctly, when you look at a case, you try to look at the environment, the vehicle and human factors; is that true?

A. Not exactly. What I'm saying is I look at the human factors. But every accident involved with the vehicle is the environment and the human factors. What I have said in my report is that I don't evaluate the vehicle and the environment. Although, the environment in this case, I'm not aware of any -- of the elements, the road or the weather, if it would have made any difference.

Q. Did you do anything in this case do evaluate the relative ease or difficulty associated with controlling a tread separation when that tread separation event occurs on a 1997 Mercury Mountaineer?

A. No, I have made no analysis in this case of the Mercury Mountaineer in this case. I have read about vehicles, but, again, the vehicles is not my area of expertise.

Q. But in deciding whether someone has over reacted or over correct or executed a poor turning maneuver, don't you have to necessarily consider the response of a vehicle to any such turning maneuvers?

A. I certainly have made some analysis of that. It

is not so much my analysis of the vehicle. For example, the provided information that at the time of this -- for example, the turn to the right where the vehicle first lost control from the standpoint of the first marks on the road, that -- at that time, the tire event, the detread was over. Therefore, the right turn involved basically a vehicle that was substantially the same as a good four tires on the vehicle.

Q. Let me ask you whether or not you agree that the statement from Firestone contained in Exhibit 9 that, "An oversteer vehicle is extremely difficult for most drivers to control, particularly at interstate highway speeds where it can become directionally unstable."

MR. BROSSEAU: Objection. Foundation.

THE WITNESS: No. 9, you say?

BY MR. VOSE:

Q. Exhibit 9, if you look at the bottom, Page 2.

A. Oh, okay. Well, again, I don't have the expertise. That's a vehicle dynamics question. But my understanding is that it depends on where you are and what is going on as to whether a vehicle is even oversteered. For example, for all practical purposes the time this right-hand turn is made it was not an oversteered vehicle. That comes from Mr. Arndt.

Q. Wasn't it an oversteered vehicle when he made a

turn right before making that turn to the right?

MR. BROSSEAU: Objection. Foundation.

THE WITNESS: Again, I didn't analyze that part of it.

BY MR. VOSE:

Q. When he made his final turn to the left, it was an oversteer, wasn't it?

MR. BROSSEAU: Objection. Foundation.

THE WITNESS: Again, I haven't analyzed it. That is up to the vehicle dynamics people.

BY MR. VOSE:

Q. Would you agree with the statement that oversteer can make a vehicle directionally unstable subject to loss of control in the hands of most drivers?

MR. BROSSEAU: Objection. Foundation.

THE WITNESS: Again, I'm not a vehicle dynamics expert.

BY MR. VOSE:

Q. Have you ever gotten into that area?

A. I am sure from time to time I have said things about oversteered vehicles, but, again, that is not my area of expertise.

Q. Let's take a look at what has been marked as Exhibit No. 10.

(Exhibit 10 was marked.)

Q. If he did do that, he would have been doing that with an oversteer characteristic where the vehicle would have been in an oversteer condition, correct?

MR. BROSSEAU: Objection. Foundation.

THE WITNESS: That would be a vehicle dynamics question.

BY MR. VOSE:

Q. Does it effect your opinion one way or the other as to whether he executed poorly any driving or steering response in the case?

A. I think he did. I think he did execute poorly a driving response by overreaction to the right-hand turn.

BY MR. VOSE:

Q. How much did he turn the steering wheel to the right?

A. Again, I will leave that to the dynamics people.

Q. Well, if you are going to be critical of how much he turned to the right, I need to know how much you believe he turned and what yardstick you are measuring that against?

MR. BROSSEAU: Objection. Form. Argumentative.

THE WITNESS: I don't think you do need to know that because clearly he turned to much to the right and he crossed not only his own lane but the No. 2 lane and eventually went off the road. That is way too much.

BY MR. VOSE:

Q. So the mere fact that he did, in fact, lose control in your mind suggests to you that he, indeed, poorly executed the steering control.

A. In the right-hand turn, yes.

Q. It is unimportant to you in knowing whether making that right-hand turn the vehicle's handling characteristics have just changed?

MR. BROSSEAU: Object to form.

THE WITNESS: Again, as far as I know he had control of the vehicle up to that point. Clearly he did and clearly when he made that adjustment, there was no tread separation occurring.

BY MR. VOSE:

Q. Would you agree with me that if the tread had separated and that tread separation required him to turn to the left he would have been turning while this vehicle was in an oversteer condition?

MR. BROSSEAU: Foundation.

THE WITNESS: I don't because the fact that the evidence is that he turned to the right, so I'm not sure what you mean by "required."

BY MR. VOSE:

Q. Do you consider Mr. Arndt's opinions as to whether or not he made a turn ahead of time as some

A. Correct.

Q. It says, "Situational awareness, inattention, blindness." Why did you make the note about blindness?

A. That's a term used by other people in the research as to what happens when people are on a cell phones. They're distracted. The term they use is "inattention blindness." The indication is the fact that people are not paying attention to what is going on ahead of them when they became distracted.

Q. What's a scientific basis for concluding that cell phone usage played any role in this particular accident?

A. I think the scientific basis is the statistics the fact that it is shown overwhelmingly had that the risk of an accident increases with cell phone use. Not only from the data that's been collected from actual accidents but also from the standpoint of tests that are run with people using cell phones or cell phone-like systems and making driver decisions. They have found, for example, when people are on cell phones, they drive through interactions. They don't stop at stop signs like during tests.

There is also anecdotal information that indicates that drivers have been seen to clearly drive up behind a person that is stopped at a railroad crossing

with the gates down and instead of stopping, they pull around and go across the railroad have an accident. This goes on and on and on.

Q. It sounds like what you are suggesting is that because statistics suggest that risk of accident is increased four-fold, from that you infer that it played a role in this case?

A. Generally, that is the concept except then you also have other tests showing that people do make mistakes driving while using cell phones, both simulated and also actual experience. I cannot get into the mind of Mr. Walton and say what he was doing at that moment. But certainly being on the cell phone for a half hour while driving would have all the implications of what these studies are talking about of distracting a person.

Q. You arrive at that conclusion despite the fact that you have investigated dozens of roll-over accidents following alleged tread separations where people were not even arguably distracted by a cell phone, correct?

A. Not cell phone, but people are distracted by many different things. But cell phones are a major distraction.

Q. You have no actual evidence in this case in the way of witness statements or deposition testimony from anyone that, indeed, John Walton was, in fact, distracted